**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 9, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EUNICE CAMPBELL,

      Plaintiff – Appellant,

v.

GAMBRO HEALTHCARE, INC.,

      Defendant – Appellee.

No. 06-3062

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 04-CV-2416-CM)**

---

Alan V. Johnson, Sloan, Eisenbarth, Glassman, McEntire & Jarboe, Topeka,
Kansas (Stephen D. Lanterman with him on the briefs), for Plaintiff–Appellant.

John C. Stivarius, Jr., Epstein, Becker, & Green, Atlanta, Georgia (Jack D. Rowe
and Sara J. Kagay, Lathrop & Gage, Kansas City, Missouri; and Teresa B.
Stivarius and Brenton S. Bean, Epstein, Becker, & Green, Atlanta, Georgia, with
him on the briefs), for Defendant–Appellee.

---

Before **LUCERO**, **McCONNELL**, and **HOLMES**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

     Eunice Campbell appeals the district court's grant of summary judgment to

Gambro Healthcare, Inc. ("Gambro") on her claims of race discrimination under

42 U.S.C. § 1981, and interference with and retaliation for taking leave covered by the Family and Medical Leave Act ("FMLA") under 29 U.S.C. §§ 2615(a)(1)–(2). On appeal, Campbell has abandoned her § 1981 race discrimination claim, and challenges the district court's judgment only as to her interference and retaliation claims under the FMLA. We hold that when the employer cites only factors predating the employee's return to work to justify the adverse action, the claim may be brought under either a retaliation or interference theory. Evaluating Campbell's claim under both theories, we exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **AFFIRM**.

**I**

Campbell began working for Gambro as a Patient Care Technician ("PCT") in April 2001 at its Atchison, Kansas clinic.[1] Gambro is headquartered in Denver, Colorado, and operates a national chain of clinics providing end-stage renal dialysis and related services. The Atchison clinic is relatively small, with an optimal capacity of 24 to 26 patients; in fact, the clinic treated substantially fewer patients throughout Campbell's tenure. As such, the clinic was leanly staffed, employing a center director (Ilene Dwyer), a registered nurse, and two PCTs, of which Campbell was one. The clinic employed a second PCT, Pat Jackson, who had slightly more seniority than Campbell due to prior work experience.

---

[1] Campbell was originally employed by Renal Management, Inc. Gambro purchased Renal Management in 2001.

Campbell's duties included working under the nurse's supervision to provide patient care; operating, cleaning, and inspecting the dialysis machines; monitoring patients during dialysis; keeping patient records; communicating patient statuses to the nurse; and performing other functions as necessary. In addition to these core PCT duties, Campbell served as the clinic's inventory technician and unit secretary. As inventory technician, she was responsible for tracking the clinic's inventory utilizing an automated physical inventory computer system ("PICS"), recording inventory receipts, removing expired supplies from the shelves, and ensuring that the oldest supplies were used first. Her primary duty was to match physical inventory on the shelves with inventory as reflected in the PICS database. As unit secretary, she was responsible for maintaining accurate patient data, such as by preparing charts for new patients, adding new data for existing patients, coordinating patient mailings, and archiving old patient records.

On June 15, 2002, Gambro promoted Campbell to PCT II, a job title that reflected increased pay but no change in duties. Throughout her employment, and before taking medical leave, Campbell received high marks from her supervisors for her job performance.

Beginning in May 2003 and extending through the date of Campbell's termination, the Atchinson clinic suffered a steady decline in patients, with the number stabilizing at 13. Rather than lay off either PCT, Gambro asked each to

accept a reduction in hours, to 24 per week, with the option to supplement hours at neighboring clinics. At a meeting in early August 2003, Richard Pedrick, Gambro's Regional Director, met with Dwyer, Jackson, and Campbell to discuss Jackson and Campbell's options in the face of the dwindling patient count. Jackson and Campbell both chose to work a reduced schedule without seeking to supplement their hours elsewhere. By reducing labor and other costs, Gambro managed to keep the Atchison clinic afloat during this period, although it suffered a steep drop in profitability.

On or about October 9, 2003, Dwyer went on vacation, leaving the director of the nearby St. Joseph clinic, Ruby Thompson, in charge. Three days later, Campbell slipped and fell at her home, injuring her back and aggravating a preexisting degenerative back ailment. The record establishes that Campbell did not call or send a text message to Thompson prior to the start of her shift. Both parties acknowledge that Gambro policy requires an employee to notify a superior of her absence prior to the start of her shift.

On October 15 Campbell visited a doctor, who recommended she have surgery on her back. Surgery was scheduled for November 10, and Campbell applied for FMLA leave, which was approved from October 13, 2003 through January 5, 2004. Campbell's leave was backdated to October 13, the first day she was absent from work. The next day, after hearing about Campbell's request for FMLA leave, Dwyer sent Pedrick an email complaining that Campbell was

unreliable and had disturbed her vacation on account of her absence. At this point, Dwyer did not know about Campbell's fall or the nature of her condition.

During Campbell's absence a PCT from the St. Joseph clinic, Gaylene Caples, was brought into the Atchison clinic to assume Campbell's inventory duties. Caples immediately discovered major problems with the clinic's inventory. Most significantly, she discovered a $6,500 discrepancy between the inventory listed in the PICS database and the items physically present on the shelves. Gambro mandates that items used or delivered be entered into the computer system on a weekly basis, and that employees perform a physical inventory every month. Campbell does not dispute that she failed to properly update the inventory system as required by Gambro policy.

At the same time, another Atchison employee, Cindy Keling, took over Campbell's unit secretary duties. Keling noticed that several thousand sheets of old patient records were piled up in Campbell's back office. This was also a violation of Gambro policy, which requires that inactive files be sorted and stored in file cabinets at the clinic or off-site. Keling spent approximately two months sorting and processing these records. Campbell testified that the records were not processed because Dwyer redirected her to other tasks.

On December 26, 2003, just before Campbell was scheduled to return from FMLA leave, she sent Pedrick and Dwyer an email inquiring about the possibility

of supplementing her hours at St. Joseph. Pedrick emphatically rejected this idea, writing, "NOT a good option in my opinion."

Campbell returned to work on January 5, 2004. She learned that her hours had been reduced to 21 per week from 24, and that she had been stripped of her unit secretary and inventory technician duties. It is undisputed that Jackson, the senior PCT, had also had her hours cut back due to a lower patient count. Campbell received the same hourly wage and benefits she had received before taking FMLA leave.

During her first day back at work, Dwyer presented Campbell with a "corrective action form," stating that Campbell had violated Gambro's procedure for providing notice of her absence on October 13, 2003. This was the first disciplinary action to which Campbell had been subject. The form evidences Dwyer's annoyance that Campbell interrupted Dwyer's vacation and closes as follows: "It caused a serious situation in the unit due to the other PCT not having any training with inventory and unit secretary duties. . . . This has caused serious difficulties in the Atchison unit for getting everything back up to date following the time span with no one taking care of the filing, etc." Campbell refused to sign the form, arguing that she had complied with policy by notifying Thompson of her absence prior to the start of her shift.

Pedrick sent Campbell an email on January 9, 2004, informing her that Gambro had decided it could only keep one PCT at the Atchison clinic, and that

Campbell was being terminated "due to patient census and reimbursement concerns." Jackson was selected to remain "[b]ecause of recent performance concerns" with Campbell. Specifically, the email cites Campbell's failure to perform her inventory technician duties and to properly notify Thompson of her absence on October 13, 2003. Pedrick gave Campbell a choice: She could either apply for a transfer to another Gambro clinic or resign voluntarily, in which case she would receive six weeks' severance pay and would be required to sign a release from legal action. Campbell says she was under the impression that, pursuant to Gambro policy, she was ineligible to transfer until six months had elapsed from the corrective action. Gambro admits the existence of the policy, but Pedrick testified that Gambro was making an exception for Campbell with regard to the transfer and severance pay policies.

Campbell turned in her keys to Dwyer on January 14. Dwyer testified that Campbell's relinquishment of the keys signaled her resignation, and that Campbell had asked for the six weeks' severance pay, but refused to sign a release. Campbell maintains that she never told Dwyer she wanted to accept the severance pay and testified that she turned in her keys because her shift had been changed and she did not want to be questioned about being on the premises during off-hours. On January 14 Pedrick sent Dwyer an email instructing her to "start the process of ending [Campbell's] employment." Two days later, Campbell showed up for work for the final time, when Dwyer again offered her the option

of taking severance pay or seeking a transfer to another Gambro clinic. Campbell refused to sign any paperwork memorializing her termination and disputes Dwyer's characterization of their January 16 conversation.

Campbell subsequently filed suit against Gambro in federal district court in Kansas, alleging that Gambro racially discriminated against her in violation of 42 U.S.C. § 1981, interfered with her right to take FMLA leave in violation of 29 U.S.C. § 2615(a)(1), and retaliated against her for taking FMLA leave in violation of § 2615(a)(2). The district court granted summary judgment to Gambro on all claims, from which order Campbell appeals.

## II

Campbell appeals the district court's grant of summary judgment to Gambro only as to her interference and retaliation claims. We review the district court's summary judgment decision de novo to determine whether a genuine issue of material fact exists, viewing the record in the light most favorable to Campbell. Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1216 (10th Cir. 2002).

## A

Campbell asserts two alternate claims under the FMLA: (1) that Gambro interfered with her right to take FMLA leave, in violation of 29 U.S.C. § 2615(a)(1); and (2) that, upon returning to work, Gambro retaliated against her for taking FMLA leave, in violation of 29 U.S.C. § 2615(a)(2). The two theories require different showings and differ with respect to the burden of proof.

To establish an interference claim, Campbell must show: "(1) that [s]he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with h[er] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of h[er] FMLA rights." Jones v. Denver Pub. Sch., 427 F.3d 1315, 1319 (10th Cir. 2005). To make out a prima facie retaliation claim, Campbell must show that: "(1) she engaged in a protected activity; (2) [Gambro] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006). We have characterized the showing required to satisfy the third prong under a retaliation theory to be a showing of bad intent or "retaliatory motive" on the part of the employer. Id. at 1171 (quotation omitted). Notably, we interpret retaliation claims under the burden-shifting architecture of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), whereas the employer bears the burden of proof on the third element of an interference claim once the plaintiff has shown her FMLA leave was interfered with. See Metzler, 464 F.3d at 1170. Due to this difference in where the burden lies with respect to the third element of each theory, it is not unusual for a plaintiff to pursue an interference theory while the defendant argues that the evidence may only be analyzed under a retaliation theory.

- 9 -

Beyond differences in the elements and burdens of proof, the two claims differ with respect to the timing of the adverse action. In order to satisfy the second element of an interference claim, the employee must show that she was prevented from taking the full 12 weeks' of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave. See, e.g., id. at 1181 (holding that second element is satisfied when "FHLB interfered with [Metzler's] right to take up to the twelve weeks to which she was entitled under § 2612(a)(1) and denied her the right to be reinstated to her former position or an equivalent one upon her return to full-time work"); 29 C.F.R. § 825.216(a)(1). In contrast, a retaliation claim may be brought when the employee successfully took FMLA leave, was restored to her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work. See, e.g., Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1136-38 (10th Cir. 2003) (analyzing Doebele's FMLA claim under a retaliation theory when she was restored to her prior position, but soon terminated for alleged attendance problems following her return).

The district court found an interference theory to be inappropriate on these facts, finding instead that Campbell's "claims are more properly analyzed as a single retaliation claim – not as separate interference and retaliation claims." We disagree. When, as is the situation before us, the employer cites only factors predating the employee's return to work to justify the adverse action, the plaintiff

is not foreclosed from bringing an interference claim. To hold otherwise would create a perverse incentive for employers to make the decision to terminate during an employee's FMLA leave, but allow the employee to return for a brief period before terminating her so as to insulate the employer from an interference claim.

Although it vacillated on this point at oral argument, Gambro's "final explanation" of Campbell's termination is limited to factors predating her return to work. By fall of 2003, the declining patient census allowed for only one PCT to continue employment; as between Jackson and Campbell, Gambro chose Jackson due to her seniority and Campbell's inadequate performance as unit secretary and inventory technician. Pedrick, who was responsible for setting staffing levels at the Atchison clinic, had concluded by the end of 2003 that the clinic could only support one PCT. Although in August 2003 Pedrick chose to allow the two PCTs to work reduced hours rather than to terminate either one, he stated in his affidavit that by July 2003 "it was determined that it [might] be necessary to lay off one of the PCTs, unless one of the PCTs would work part-time at another clinic." Tellingly, Pedrick did not increase Jackson's hours to compensate for Campbell's absence, but instead reduced Jackson's hours from 24 to 21.

Gambro does not argue that any new facts regarding staffing needs at the Atchison clinic came to light during the period after Campbell returned to work. Nor does it argue that its understanding of Campbell's failures as unit secretary or

inventory technician changed meaningfully between Campbell's return to work and her termination. Although the record shows that Pedrick and Dwyer offered Campbell the opportunity to explain those problems after she returned, it would be a synthetic view of the facts to interpret Gambro's decision to terminate her as motivated by the inadequacy of her explanations. Rather, it was the fact of her poor performance as unit secretary and inventory technician, discovered in late October 2003, that partly motivated Gambro to choose Jackson over Campbell as the clinic's sole PCT. Accordingly, Campbell's termination was a foregone conclusion by the time she returned to work, and her "restoration" to her prior duties during the period of January 5-14, 2004 was illusory; on these facts, Campbell has satisfied the second element of her interference claim, and may proceed on that claim irrespective of whether she was, in fact, restored to her prior duties.

## B

We now turn to the question of whether the district court properly denied Campbell summary judgment on her FMLA claim under an interference theory. As Campbell has satisfied the first two elements, we must determine whether, viewing the record in the light most favorable to Campbell, a genuine issue of material fact exists as to whether "the employer's action was related to the exercise or attempted exercise of [Campbell's] FMLA rights." Jones, 427 F.3d at 1319. Once a plaintiff has proved that her employer has interfered with her right

to take FMLA leave, the employer bears "the burden of proving that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave." Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 963 (10th Cir. 2002) (citing 29 C.F.R. § 825.216(a)(1)). However, we have held that "an employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request." Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1262 (10th Cir. 1998).

Reviewing the record as a whole, we determine that Gambro has met its burden on the third element, and that no genuine issue of material fact exists with respect to its reasons for terminating Campbell. Ample undisputed evidence points to Gambro's difficulties maintaining the profitability of the Atchison clinic as the patient census declined. Pedrick discussed the possibility of reducing staffing with Dwyer, Jackson, and Campbell in August 2003, well before Campbell took leave. It is undisputed that the profitability pressures persisted through the duration of Campbell's leave. Nor does Campbell contest that she was responsible for problems with inventory and patient records discovered during her absence, except to say that she had a valid explanation for some of the inventory problems.

Most of Campbell's brief attacks the admittedly ham-handed manner in which Gambro appears to have handled her termination. Although Pedrick told Campbell he would seek to place her with another clinic, evidence suggests such a placement may have been infeasible. In addition, he offered Campbell severance pay without clearly explaining that this was an exception to Gambro's normal termination policy. Although Gambro might have handled her termination in a different manner, such as by firing her soon after the unit secretary and inventory technician problems were discovered, this fact is immaterial to Campbell's interference claim, because it does not establish a causal connection between her termination and her FMLA leave.

Campbell cites to three pieces of evidence in the record that she argues could be construed to tie her termination to her taking of FMLA leave: (1) Dwyer's email of October 16, 2003, expressing frustration with Campbell's unexpected absence and complaining that it had interrupted her vacation, (2) the corrective action form presented to Campbell on January 5, 2004, and (3) Pedrick's email to Campbell of January 9, 2004. Even viewing the record in the light most favorable to her, we hold that no reasonable jury could, on the basis of this evidence, find for Campbell. Nowhere does Pedrick's email reference Campbell's FMLA leave – rather, it clearly implicates Campbell's demonstrated failure to notify Thompson of her absence on October 13, 2003.

In contrast, although it is not the most evident reading of either, both the Dwyer email and corrective action form can be read to (negatively) reference Campbell's FMLA leave. Dwyer's email was sent after Pedrick had informed her that Campbell "needs immediate medical leave through December," and states: "I can't depend on some folks. Eunice has always thought she could take time off but I couldn't." Although the corrective action form states that the "nature of the problem" is "incorrect procedure for calling in for STD," some of the body text refers to longer-term difficulties associated with finding staff to fill in for Campbell while she was on leave.

Nevertheless, even if we assume the email and corrective action form support an inference of Dwyer's bad intent, there is no evidence in the record demonstrating that Dwyer played a role in the termination decision. Rather, the evidence shows that Pedrick was the decisionmaker, came to his own independent conclusion with respect to the termination, and was not a "rubber stamp" for Dwyer. See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1231 (10th Cir. 2000) (holding, in the § 1981 discrimination context, that a subordinate's bad motive may only be imputed to the decisionmaker if evidence suggests the decisionmaker was a rubber stamp for the subordinate's prejudice). Moreover, the fact that Dwyer presented Campbell with the corrective action form, together with other evidence in the record, shows that she did not anticipate Campbell's termination, much less agitate in favor of terminating her. Accordingly, Dwyer's

email and the corrective action form are insufficient to create a material dispute of fact with respect to the third element of Campbell's interference claim.

C

Campbell also challenges the district court's grant of summary judgment to Gambro on her retaliation claim. As discussed supra, the burden of proof for retaliation claims differs from interference claims – the third element of a retaliation claim is evaluated under the McDonnell Douglas burden-shifting framework. Metzler, 464 F.3d at 1172. The parties concede that Campbell has established a prima facie case of retaliation, and that Gambro has articulated a nondiscriminatory reason for her termination. The burden thus shifts to Campbell to "show that there is a genuine dispute of material fact as to whether [Gambro's] reasons for terminating her are pretextual." Id. Campbell may meet this burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation omitted).

Campbell alleges that five pieces of evidence in the record collectively establish that Gambro's stated reasons for terminating her are pretextual: (1) the close temporal proximity between her return from FMLA leave and her termination; (2) a pattern of retaliatory employment actions following her return

- 16 -

from leave, including Dwyer's corrective action form, the removal of her inventory technician and unit secretary duties, the reduction in her weekly hours, and, finally, her termination; (3) her prior history of excellent evaluations and Gambro's failure to subject her to discipline prior to her taking leave; (4) the issuance of a corrective action form after only one unscheduled absence; and (5) the falsity of Gambro's explanations for its actions.

Taking these in turn, we have never allowed "even very close temporal proximity [taken alone] to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext." Metzler, 464 F.3d at 1172 (quotations omitted). Rather, to show pretext Campbell "must . . . present evidence of temporal proximity plus circumstantial evidence of retaliatory motive." Id. Campbell's argument with respect to alleged retaliatory employment actions could potentially preclude summary judgment, see Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996), but in this case the cited actions do not "giv[e] rise to an inference of retaliatory animus." Metzler, 464 F.3d at 1173. There is no evidence that Campbell received the corrective action form or had her unit secretary and inventory technician duties removed in retaliation for taking FMLA leave. Instead, those actions were taken in response to her undisputed violations of Gambro policy, which came to light while she was on leave, whereas the termination itself was clearly motivated by the reasons discussed in analyzing Campbell's interference claim. Campbell's reduction in hours cannot be termed

retaliatory, because it is undisputed that Jackson, the clinic's other PCT, also had her hours cut back due to the reduced patient census. Campbell's hourly wage and benefits remained the same.

Evidence of discrepancies between an employer's prior treatment of a plaintiff and its treatment of her following her return from leave may be used to demonstrate pretext. See Jaramillo v. Colo. Jud. Dept., 427 F.3d 1303, 1308 (10th Cir. 2005). Yet here, where Gambro's decision to discipline Campbell was informed by her demonstrated failures to abide by Gambro policy or adequately perform her unit secretary and inventory technician duties, there is no ground for deeming such discrepancies retaliatory. Fourth, Campbell argues that Gambro misapplied its own policy in issuing her a corrective action form. An employer's failures to follow written or unwritten policy may support a showing of pretext, particularly if other similarly-situated employees were treated differently. See Kendrick, 220 F.3d at 1232. With respect to the corrective action form, however, its issuance was explicitly permitted by written Gambro policy, and it responded to Campbell's demonstrated violation of that policy. As such, it cannot be used to show pretext. Moreover, there is no evidence in the record that Jackson or any other similarly-situated employee was treated differently under similar circumstances. Nor could Pedrick's deviation from normal Gambro severance policy be termed retaliatory – just the opposite, in fact, as it represented a partly botched attempt to ameliorate Campbell's termination. Finally, Campbell argues

that the reasons Gambro cites in support of its disciplinary actions are not worthy of credence, relying on the Supreme Court's decision in <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133 (2000), but this argument must fail for the same reasons discussed above. Hence, a reasonable jury could not infer a retaliatory motive therefrom. <u>See</u> <u>Metzler</u>, 464 F.3d at 1178.

In sum, the record in this case indicates that Campbell was fired due to the declining patient census at the Atchison clinic, coupled with her poor performance of her unit secretary and inventory technician duties. None of the evidence cited by Campbell demonstrates that Gambro's stated justifications for her termination "are so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that [Gambro] did not act for those reasons." <u>Id.</u> at 1179. Accordingly, we conclude that Campbell has failed to meet her burden to demonstrate pretext.

**III**

The judgment of the district court is **AFFIRMED**.