**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 27, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LINDA A. TIMMERMAN,

      Plaintiff - Appellant,

v.

U.S. BANK, N.A.,

      Defendant - Appellee.

No. 06-1185

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 04-CV-01903-REB-MJW)**

Mari A. Newman, (Darold W. Killmer and Sara J. Rich, with her on the briefs), Killmer, Lane & Newman, L.L.P., Denver, Colorado, for Plaintiff - Appellant.

Christine K. Lamb (and Thomas D. LeLand, on the brief), Hale, Friesen, L.L.P., Denver, Colorado, for Defendant - Appellee.

Before **KELLY, ALARCON**,[*] and **LUCERO**, Circuit Judges.

**KELLY**, Circuit Judge.

---

[*]The Honorable Arthur L. Alarcon, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

Plaintiff-Appellant Linda A. Timmerman was terminated from her position as branch manager at U.S. Bank after bank management discovered that she had refunded at least $1,099 worth of overdraft fees to two subordinates' bank accounts. In response, Ms. Timmerman brought sex and age discrimination claims against U.S. Bank pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA"). After U.S. Bank brought several state law counterclaims against Ms. Timmerman, she amended her complaint to add an abuse of process claim against U.S. Bank under state law, retaliation claims against U.S. Bank under both Title VII and the ADEA, and conspiracy claims against U.S. Bank under 42 U.S.C. § 1985(2). Following discovery, the district court granted U.S. Bank's motion for summary judgment as to each of Ms. Timmerman's federal claims and refused to exercise supplemental jurisdiction over the parties' remaining state law claims. See Timmerman v. U.S. Bank, No. 04-CV-01903, 2006 WL 894894, at *1 (D. Colo. Mar. 31, 2006). This appeal followed. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm the district court's grant of summary judgment.

Background

Ms. Timmerman began her career in 1988 at U.S. Bank's predecessor company, Bank Western, as a part-time teller. By 1997, Ms. Timmerman had attained the position of retail market manager, a position in which she was

responsible for managing (with co-worker Chad Royle) several bank branches and supervising the branch managers at those locations. In 2001, Trish Johnson became the northern Colorado district manager to whom Ms. Timmerman reported. That same year, during the course of a post-acquisition restructuring at U.S. Bank, the position of retail market manager, Ms. Timmerman's position, was re-titled. As a result of the changes, both Ms. Timmerman and her male co-worker were demoted to the position of branch manager.

Ms. Timmerman continued in the position of branch manager until April 30, 2003 when her employment with U.S. Bank was terminated. At the time of her termination, Ms. Timmerman was fifty-two years old. As part of corporate security, U.S. Bank runs quarterly checks on fee reversals in its employees' accounts and automatically generates a report for fee reversals in excess of $100. According to U.S. Bank, it fired Ms. Timmerman because, during the review period from November 2002 to January 2003, she refunded thirty-one overdraft charges, totaling $1,099, to two coworkers' accounts in violation of company policy. Ms. Timmerman does not dispute that she made the refunds, but claims instead that she was not aware the refunds were made in contravention of company policy, that she was only looking out for the financial interests of her co-employees, and that she did not think the refunds cost U.S. Bank any money.

Shortly after her termination, Ms. Timmerman brought suit against U.S. Bank, alleging sex and age discrimination in violation of Title VII and the ADEA.

During the course of discovery, Ms. Timmerman admitted that, as branch manager, she had inherited an internal "party fund" account and had partially funded that account using bank fees, including coin counting and notary fees. In deposition testimony, Ms. Timmerman also revealed that, subsequent to her termination, she removed $480 dollars from the "party fund" and deposited it into a personal account at another bank. Shortly after these admissions, U.S. Bank sought and was granted leave to assert state law counterclaims against Ms. Timmerman for civil theft, conversion, unjust enrichment, conspiracy, aiding and abetting a breach of fiduciary duty, and fraudulent misrepresentation. In response to U.S. Bank's counterclaims, Ms. Timmerman sought and was granted leave to amend her complaint to add claims for retaliation under Title VII and the ADEA, abuse of process, and conspiracy to violate her civil rights in violation of 42 U.S.C. § 1985(2).

U.S. Bank next moved for summary judgment as to all of Ms. Timmerman's claims along with its own claim against Ms. Timmerman for civil theft. The district court granted U.S. Bank's motion as to each of Ms. Timmerman's federal claims and declined to exercise supplemental jurisdiction over both parties' remaining state law claims. In so doing, the district court imposed a twenty-page limit on the length of both parties' summary judgment briefs. On appeal, Ms. Timmerman argues: (1) that the district court abused its discretion in limiting the length of the parties' summary judgment briefs to

twenty pages; (2) that the district court erred in granting summary judgment to U.S. Bank on her sex and age discrimination claims because she brought forth sufficient evidence to demonstrate that U.S. Bank's asserted legitimate reason for her termination is pretextual; (3) that the district court erred in granting summary judgment to U.S. Bank on her Title VII and ADEA retaliation claims; and (4) that the district court erred in granting summary judgment to U.S. Bank on her 42 U.S.C. § 1985(2) claims.

## Discussion

I.      The District Court's Twenty-Page Limit on Summary Judgment Briefs

Ms. Timmerman contends that the district court committed reversible error when it denied her request to submit a response brief to U.S. Bank's motion for summary judgment that exceeded the district court's self-imposed twenty-page limit. Ms. Timmerman maintains that the "20-page limitation, as applied to this particular case, prevented a full (or even adequate) recitation of the facts and legal arguments necessary to effectively combat the summary judgment motion." Aplt. Br. at 42-43. The district court's refusal to allow Ms. Timmerman additional pages of briefing is best characterized as a "supervision of litigation" decision, which we review for an abuse of discretion. See Pierce v. Underwood, 487 U.S. 552, 559 n.1 (1998); see also Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1192 (10th Cir. 2006).

When there is no federal rule pertaining to a particular subject or issue, federal judges may regulate the practice of law in their courts "in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and local rules of the district." Fed. R. Civ. P. 83(b). Here, Ms. Timmerman does not argue that the district court's self-imposed twenty-page limitation is on its face inconsistent with federal law. Moreover, no federal rule, including Fed. R. Civ. P. 56, dictates the number of pages to be permitted litigants in a response brief to a summary judgment motion. And the local rules of the District of Colorado are similarly silent regarding page limitations on such briefs. See D. Colo. L. Civ. R. 56.1. Ms. Timmerman's primary complaint about the district court's page limitation is that she was unable to present "further and more detailed information" regarding her claims, and that it led to the dismissal of her case due to insufficient evidence or argument. Aplt. Br. at 42-43.

The only specific evidence that Ms. Timmerman claims she would have been able to present to the district court in the absence of its page limitation is evidence that U.S. Bank knew of the "party fund," that Ms. Timmerman had inherited the fund from a predecessor, and that the "party fund" was funded through various sources. See Aplt. Br. at 57 n.10. A review of Ms. Timmerman's amended response to U.S. Bank's motion for summary judgment, which fully complied with the district court's page limitation, reveals that Ms. Timmerman indeed presented all of this evidence to the district court, albeit in a footnote, and

-6-

we presume it was considered.  See Aplt. App. at 587-88 n.11.  Moreover, the district court's twenty-page limitation also applied to U.S. Bank's summary judgment briefs, and therefore, Ms. Timmerman was given twenty pages of briefing in order to respond to twenty pages of argument.

To be sure, one value implicit in Fed. R. Civ. P. 56 is that each party to a summary judgment motion, both moving and non-moving, be given an adequate opportunity to present argument and evidence supporting its respective position.  See Fed. R. Civ. P. 56(f); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986).  We can imagine a case where a page limitation (even one set at twenty pages) would be an abuse of discretion, and so district courts should remain flexible in the application of such a limitation.  Nonetheless, Ms. Timmerman has not demonstrated that the district court's twenty-page limitation, in this case, rises to the level of an abuse of discretion.

II.     Summary Judgment as to Ms. Timmerman's Federal Claims

We review a district court's grant of summary judgment de novo, applying the same standards as the district court.  Hackworth v. Progressive Cas. Ins. Co., 468 F.3d 722, 725 (10th Cir. 2006).  Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A.  Title VII and ADEA Sex and Age Discrimination Claims

Ms. Timmerman alleges that she was terminated from her branch manager position at U.S. Bank because she is a woman over forty years of age.  She claims that her manager, Trish Johnson, preferred younger men in the position of branch manager and that U.S. Bank's proffered legitimate reason for her termination is merely pretext for Ms. Johnson's animus against females over the age of forty.  U.S. Bank, in turn, argues that Ms. Timmerman has failed to bring forth sufficient evidence that its proffered nondiscriminatory reason for her firing is pretextual.  The district court agreed with U.S. Bank.

Ms. Timmerman asserts both a sex discrimination claim pursuant to Title VII and an age discrimination claim pursuant to the ADEA.  Title VII, among other things, makes it unlawful for an employer to discharge any individual on account of that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The ADEA, on the other hand, "broadly prohibits arbitrary discrimination in the workplace based on age."  Lorillard v. Pons, 434 U.S. 575, 577 (1978) (citing 29 U.S.C. § 623(a)).

Where, as here, an employee's sex or age discrimination claim relies exclusively on circumstantial, rather than direct, evidence, we apply the burden-shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  See Garrison v. Gambro, Inc., 428 F.3d 933, 936-37 (10th Cir. 2005) (invoking the McDonnell Douglas scheme where the plaintiff had asserted both a

Title VII sex discrimination claim and an ADEA age discrimination claim). That scheme first allocates the burden of production to the employee to establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. If the employee is successful in doing so, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. The employer's articulation of a legitimate, nondiscriminatory reason for the adverse employment action causes the presumption of discrimination attendant to the prima facie showing of discrimination "to simply drop[] out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). The employee then has the full burden to show that the employer discriminated on the basis of sex or age. Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir. 2005). "The [employee] may do so by . . . showing that the proffered reason is a pretext for illegal discrimination . . . ." Ingels v. Thiokol Corp., 42 F.3d 616, 621 (10th Cir. 1994), abrogated on other grounds by Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003).

A showing of pretext does not require a plaintiff to offer any direct evidence of actual discrimination. Bryant, 432 F.3d at 1125. An employee may show pretext based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief. Morgan v. Hilti Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).

Demonstrating pretext enables a plaintiff to survive summary judgment. Randle v. City of Aurora, 69 F.3d 441, 452 (10th Cir. 1995).

Here, U.S. Bank does not dispute that Ms. Timmerman has established a prima facie case of sex and age discrimination. Ms. Timmerman, for her part, does not dispute that U.S. Bank has come forth with a legitimate, nondiscriminatory reason for her termination—that she reversed overdraft fees on two fellow employees' accounts in the amount of $1,099. The sex and age discrimination claims, then, hinge upon a showing of pretext. Ms. Timmerman asserts that the following evidence demonstrates the pretextual nature of U.S. Bank's proffered nondiscriminatory reason for her firing: (1) within two years of becoming district manager, Ms. Johnson, "replaced every single older female branch manager with a young man," Aplt. Br. at 46; (2) U.S. Bank failed to apply its progressive discipline policy in Ms. Timmerman's case; (3) Ms. Johnson treated Ms. Timmerman more harshly than other employees who violated the same policy; and (4) there were "disturbing procedural irregularities" surrounding Ms. Timmerman's termination, Aplt. Br. at 51.

We note at the outset, however, that there exists fairly strong evidence in the record that Ms. Johnson did not make the final decision to terminate Ms. Timmerman. Rather, it appears that Steve Lovas, the president of the region in which Ms. Timmerman's branch was located, made the final termination decision, and Linda Sincoff, an employee in Human Resources, made the recommendation

-10-

that she be fired.  See Aplt. App. at 640-42.  Because there is no evidence that Ms. Johnson actually caused Ms. Timmerman's termination, nor that Mr. Lovas was merely a rubber stamp for Ms. Johnson's alleged prejudice, Ms. Timmerman's claims against U.S. Bank necessarily fail.  See Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1290 (10th Cir. 2007).  Nonetheless, there is deposition testimony from Ms. Timmerman indicating that Ms. Johnson informed her she was being terminated, see Aplt. App. at 130, and U.S. Bank, in its brief on appeal, admits that "Johnson terminated Timmerman's employment," Aplee. Br. at 30.  As a result, and in an abundance of caution, our analysis proceeds as if Ms. Johnson did indeed terminate Ms. Timmerman.

> 1.  Ms. Johnson's Replacing Female Branch Managers Over the Age of Forty With Younger Men

As previously mentioned, in 2001, U.S. Bank underwent a post-acquisition reorganization, at which time Ms. Johnson became the northern Colorado district manager in charge of six northern Colorado U.S. Bank branches.  Moreover, Ms. Timmerman, who prior to the reorganization was a retail market manager (a position higher than a branch manager), was demoted to branch manager. Whereas five of the six branches under Ms. Johnson's control were managed by females over forty years of age prior to the reorganization,[1] after the

---

[1]  The one branch not managed by a female over forty years of age was managed by a female under forty years of age.  See Aplt. Br. at 29.

reorganization only one of the six branches—Ms. Timmerman's Loveland, Colorado branch—was managed by a female over forty. Despite the fact that Ms. Timmerman was given a branch manager position, she argues that Ms. Johnson's replacement of older female branch managers with younger males during the reorganization demonstrates that the proffered reason for her firing is pretext for Ms. Johnson's alleged animus against older females.

"It is uniformly recognized that statistical data showing an employer's pattern of conduct toward a protected class can create an inference that an employer discriminated against individual members of the class." Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991). On the other hand, "[s]tatistics taken in isolation are generally not probative of . . . discrimination," Jones v. Unisys Corp., 54 F.3d 624, 632 (10th Cir. 1995), and statistical evidence on its own "will rarely suffice" to show pretext, Ortiz v. Norton, 254 F.3d 889, 897 (10th Cir. 2001). At the very least, in order to create an inference of pretext, "a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals." Fallis, 944 F.2d at 746.

Ms. Johnson's failure to rehire other older female branch managers two years prior does not suffice to demonstrate a genuine issue of material fact as to whether the reason given for Ms. Timmerman's termination was false. In order for an employer's former adverse employment actions to have any probative

-12-

effect on an employee's ability to demonstrate pretext as to subsequent adverse employment actions, there must be some logical nexus between the former and subsequent actions. Cf. Coletti v. Cudd Pressure Control, 165 F.3d 767, 777 (10th Cir. 1999) (allowing the testimony of other employees as to an alleged pattern and practice of discrimination only where the plaintiff "show[s] the circumstances involving the other employees are such that their statements can 'logically or reasonably be tied to the decision to terminate the plaintiff'"(internal modifications omitted)); Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 531-32 (10th Cir. 1994). When we say that statistical evidence must compare employees that are "similarly situated," we ordinarily mean that the situation of the employees in the protected class must have been comparable to the situation of the employees in the non-protected class who were allegedly treated more favorably. See Cone, 14 F.3d at 532-33. Nonetheless, we think it a matter of common sense that the probative value of statistical evidence will also vary depending upon the degree of difference between the situations of the protected employees within the statistical data set and the employee seeking to utilize that data. The fact that a plaintiff is required to demonstrate pretext does not grant a jury license to second-guess all prior hiring, firing and disciplinary decisions no matter how attenuated they might be from the challenged action. Cf. Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.1999). ("Our role is to prevent unlawful hiring practices, not to act

as a 'super personnel department' that second guesses employers' business judgments.").

Ms. Timmerman's circumstances are not remotely comparable to what occurred when Ms. Johnson did not rehire the female branch managers. To begin, Ms. Timmerman was not among the group of incumbent branch managers that had to reapply for their positions. See Aplt. App. 114-16. Instead, Ms. Timmerman and Chad Royle, a male retail market manager, were both simply assigned branches to manage.[2] In fact, Ms. Timmerman admits that "[a]nyone that was in my position or the sales manager position[] sort of got to choose what branches they wanted to be in." Aplt. App. at 116.

Also, despite Ms. Johnson's alleged animus, Ms. Timmerman survived the reorganization. Two years later,[3] she was terminated for disciplinary reasons. Thus, there is a logical disconnect between the situation of the incumbent female branch managers and Ms. Timmerman's firing. Had Ms. Timmerman brought a charge of discrimination arising out of her demotion during the reorganization,

---

[2] Ms. Timmerman does not bring a claim that her demotion from retail market manager to branch manager was discriminatory.

[3] For a logical nexus to exist, there must be temporal proximity between the former and the contested adverse employment actions. See Bingman v. Natkin & Co., 937 F.2d 553, 556-57 (10th Cir. 1991) ("[E]vidence not too remote in time that defendant terminated others in the [same] age group would be entirely relevant to the question of defendant's [discrimination]."(emphasis added)). Thus, the two year gap between the employment actions at issue in this case diminishes the evidentiary value of the former adverse employment actions.

then statistical evidence that a large percentage of female branch managers over the age of forty were not rehired during the same time period would surely have been probative of pretext. On the other hand, the same statistical evidence is not probative in this lawsuit where the alleged discriminatory animus in the decision to terminate—an entirely different adverse employment action—occured two years after the protected employees within the statistical data set were not rehired and under completely different circumstances.[4]  See Baylie v. Fed. Reserve Bank, 476 F.3d 522, 524 (7th Cir. 2007) ("In individual [discrimination] cases, studies of probabilities are less helpful."); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir. 1993) ("[A] company's overall employment statistics will have little direct bearing on the specific intentions of the employer when dismissing a particular individual.").  Given the large disparity in circumstances, we doubt the evidence regarding the two-year-old failure to rehire the incumbent female branch managers meets the relevance standard of Fed. R. Evid. 401,[5] but even if it does,

---

[4]  We also note that Ms. Timmerman's proffered sample is too small to provide reliable results.  See Fallis, 944 F.2d at 746 (explaining that a sample size of nine is too small to provide reliable statistical results); cf. Mayor of Phila. v. Educ. Equal. League, 415 U.S. 605, 621 (1974) (noting concern with sample size of thirteen).

[5]  See Baylie, 476 F.3d at 524 ("Statistical analysis is relevant in the technical sense that it 'has a tendency to make the existence of a material fact more probable or less probable than it would be without the evidence.'  Fed. R. Evid. 401.  But data showing a small increase in the probability of discrimination cannot by itself get a plaintiff over the more-likely-than-not threshold; it must be coupled with other evidence, which does most of the work.").

no rational trier of fact could infer pretext from it in Ms. Timmerman's case. See

Anderson, 477 U.S. at 250-51.

Finally, the evidence does not support Ms. Timmerman's argument that Ms.

Johnson's failure to rehire more incumbent female branch managers was

discriminatory in the first place. During the August 2001 reorganization at U.S.

Bank, the position of branch manager was re-titled sales and service manager, a

position which focused primarily on operations and service. The new branch

manager position, post-reorganization, was heavily focused on sales. Apparently,

as a result, the incumbent branch managers automatically became sales and

service managers and were given the option of applying for a branch manager

position if they so desired.

The problem for Ms. Timmerman is that the evidence in the record

demonstrates that only one of the incumbent branch managers (Connie Harding)

applied for the new branch manager position.[6] Ms. Harding was interviewed for a

_____

[6] The five branch managers at the time of the reorganization, other than Ms. Timmerman, were Connie Harding, Kelly Moe, Janet McDowell, Marilyn McJilton, and Janeen Johnson. See Aplt. Br. at 29. Ms. Harding did apply for the branch manager position, and was interviewed, but was not selected. Aplt. App. 105. Ms. Moe remained in the position of sales and service manager, and there is no evidence in the record that in 2001 she applied for the position of branch manager. Id. at 207-08. Moreover, when a branch manager position became available in 2003 she was not interested in applying because she felt she had an insufficient background in sales. Id. at 208. Ms. McDowell specifically stated in a declaration that she "was not interested and . . . did not apply for a Branch Manager position because [she does] not have a strong sales background." Aplt. App. at 199. Although the record is otherwise silent as to whether either Ms.

-16-

branch manager position, but Ms. Johnson determined she was not the best-qualified candidate because she did not have a strong sales background.[7] Aplt. App. at 105, 638. Ms. Timmerman has offered no evidence that this reason was pretextual. Nor is there evidence tending to show that any of the incumbent branch managers, other than Ms. Harding, even applied for a new branch manager position. Although Ms. Timmerman contends in her affidavit that Ms. Johnson discouraged Ms. McDowell from applying, no supporting facts based on personal knowledge are included. Additionally, Ms. Timmerman's assessment of the applicants' relative qualifications is based on her subjective and limited knowledge of the respective applicants and applicant pools. And she has not shown an overwhelming disparity in the qualifications of those who were and were not hired as branch managers. See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1319 (10th Cir. 1999), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) ("[W]e emphasize that an employer does not violate Title VII by choosing between equally qualified

McJilton or Ms. J. Johnson applied for a new branch manager position, Trish Johnson testified that Ms. Harding was the only incumbent branch manager to apply for the position, Aplt. App. at 638, and Ms. Timmerman has offered no evidence to the contrary.

[7] That Ms. Johnson could have concluded that Ms. Harding was not the best-qualified candidate for the sales-intensive position of branch manager is supported by the uncontradicted evidence that Jeff Jiron, the individual who received the branch manager position instead of Ms. Harding, had many years of sales experience and was in the top ten percent of all U.S. Bank employees in sales. Aplt. App. at 180.

-17-

candidates, so long as the decision is not based on unlawful criteria. . . . The disparity in qualifications must be 'overwhelming' to be evidence of pretext."). Finally, the evidence indicates that more men applied for the open branch manager positions than did women, and thus the chance that those positions would be filled with men was naturally greater. In short, Ms. Timmerman has not eliminated the very distinct possibility that "[Ms.] Johnson replaced every female branch manager with a young man" not out of discriminatory animus, but because the female branch managers either did not apply for the new branch manager position or were not as qualified as a competing younger male.

It also appears that Ms. Timmerman is attempting to use Ms. Johnson's prior treatment of the female branch managers when compared with the hiring decisions of another district manager (in a contiguous Wyoming district) to show that some general disdain for females over forty years of age tainted Ms. Johnson's decision to terminate her. Admittedly, we have previously held that evidence of discrimination in employment decisions affecting other workers "could support an inference that the decision makers harbored a bias against [the protected class] which might have affected other decisions, including the decisions adverse to [the plaintiff]." Ortiz, 254 F.3d at 896. This does not mean, however, that evidence as to the prior mistreatment of employees in a protected class necessarily gives rise to an inference that all subsequent employment decisions adversely affecting that protected class or someone in it, no matter how

-18-

unrelated, are also tainted with bias. Rather, "some nexus between th[e] circumstantial evidence [of general bias] and [the] decision to terminate . . ." is required. English v. Colo. Dep't of Corr., 248 F.3d 1002, 1010 (10th Cir. 2001). This generally requires the plaintiff to show that the alleged general discriminatory animus on the part of the employer played a direct role in the adverse employment decision in the plaintiff's case. Id.; see also id. at 1013 (Lucero, J., concurring). In the instant case, Ms. Timmerman has brought forth no evidence that might arguably show a nexus between Ms. Johnson's alleged general bias against older females (assuming she even had one) and her firing of Ms. Timmerman for the reversal of overdraft fees. Thus, Ms. Timmerman's proffered evidence regarding Ms. Johnson's hiring of younger males to run five of the six northern Colorado branches does not demonstrate pretext.

Although Ms. Timmerman argues otherwise, our prior decision in Greene v. Safeway Stores, 98 F.3d 554 (10th Cir. 1996) does not dictate a different conclusion. To begin, Greene is not a case about pretext. The issue we confronted in Greene was whether the district court erred in taking the case away from the jury by granting judgment as a matter of law at the close of the plaintiff's case. Id. at 558. Our task, therefore, was to determine whether Mr. Greene had succeeded in establishing a prima facie case of age discrimination under the McDonnell Douglas scheme or, in the alternative, whether he had met his evidentiary "burden directly, by presenting direct or circumstantial evidence

that age was a determining factor in his discharge." Id. at 557. Because Mr. Greene had succeeded in presenting sufficient evidence to establish a prima facie case directly, we did not answer the question of whether he had also established a prima facie case under the McDonnell Douglas burden-shifting scheme.[8] Ms. Timmerman, on the other hand, relies exclusively on the McDonnell Douglas burden-shifting framework, not on direct evidence of discrimination, and thus any value Greene might have to her case is strictly through analogy.

Unfortunately for Ms. Timmerman, Greene is hardly analogous to the instant case. In Greene, each and every one of the adverse employment actions on which the plaintiff relied had occurred within twelve months of the adverse employment action that the plaintiff suffered. See id. at 560. Thus, the temporal proximity that is lacking in this case was obviously present in Greene. There was also a stronger indication in Greene that the other employees had been adversely affected by the same discrimination that Mr. Greene claimed to have suffered; all retired, resigned, or were fired within a short period of time. See id. at 560-61. Here, the incumbent branch managers merely had their titles changed and were offered the opportunity to apply for the new branch manager position (and only

_____

[8] We did suggest, however, that Mr. Greene had failed to establish one or more elements of a prima facie case under McDonnell Douglas. See id. at 560 ("In the instant case, however, we need not reach the issue whether this Circuit allows a plaintiff in an 'extraordinary' situation to present a prima facie case through the McDonnell Douglas burden shifting approach even though the plaintiff fails to satisfy one or more of the prongs.").

-20-

one took advantage of that opportunity). It is a stretch to say that these "adverse" employment actions (if that is even an accurate characterization of them) fall into the same category as Ms. Timmerman's termination two years later for refunding overdraft fees on coworkers' accounts. Finally, in Greene, there was additional evidence of discrimination—namely, the statements of Safeway's president—from which a jury could infer discriminatory animus. As will be discussed further below, there is no similar evidence of discriminatory animus in this case. Consequently, Greene is of no assistance to Ms. Timmerman in her quest to avoid summary judgment.

2. U.S. Bank's Failure to Utilize its Progressive Discipline Policy

Ms. Timmerman next maintains that U.S. Bank's failure to utilize its policy of progressive discipline in her case demonstrates pretext. It is well-established that pretext can be shown by "evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).

As an initial matter, it is abundantly clear that U.S. Bank's policies, at the time of Ms. Timmerman's firing, forbade a branch manager from refunding fees on branch employees' accounts without approval from higher powers. U.S. Bank's employee handbook stated:

Employees are not allowed to process or approve transactions relating

> to . . . the accounts of . . . personal acquaintances . . . . Specifically, this includes, but is not limited to, refunding, reversing or waiving fees . . . . There may be other specific restrictions pertaining to transactions on . . . the accounts of . . . co-workers.

Aplt App. at 162. And both U.S. Bank's code of ethics and business conduct and its manager's guide to the code of ethics contained the same, or a very similar, provision. See Aplt. App. at 165, 167. Moreover, any ambiguity regarding the ability of a branch manager to unilaterally approve fee reversals on her employees' accounts was resolved when in December 2001 Mr. Lovas sent a memorandum to all employees reiterating U.S. Bank's policy on fee reversals and explaining that "there may be times when employees have legitimate requests to have fees refunded or waived. However, in order to avoid conflicts or misunderstandings, all such requests must go through a District Manager, Market President or myself." Aplt. App. at 168. Lastly, numerous other branch managers indicated that they were aware and understood that all fee reversals on coworkers' accounts required at least district manager approval.[9] See Aplt. App. at 173, 181, 183, 185. As a result, U.S. Bank could reasonably believe that Ms.

---

[9] Ms. Timmerman argues that she never received Mr. Lovas' memo and that she did not believe that her subordinates fell under the definition of "coworker." Ms. Timmerman's subjective intentions, however, have no bearing on the question of pretext. Cf. Furr v. Seagate Tech., Inc., 82 F.3d 980, 988 (10th Cir. 1996). What matters is whether U.S. Bank and Ms. Johnson could have reasonably believed that company policy had been violated. See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) ("The test is good faith belief.").

Timmerman had violated company policy. See Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000) ("[T]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine . . . .").

Whether, given U.S. Bank's reasonable belief that Ms. Timmerman had violated company policy, its decision to immediately terminate her is evidence of pretext constitutes an entirely distinct question. It is one that Ms. Timmerman requests we answer in the affirmative because she claims that U.S. Bank failed to follow a mandatory progressive discipline policy when it fired her. The fallacy in Ms. Timmerman's argument is that U.S. Bank, at the time of her termination, had no policy requiring progressive discipline where employees were discovered to have refunded fees on coworkers' accounts. Instead, U.S. Bank policy made it crystal clear that termination could result from improper fee reversals.[10] Ms. Timmerman even admits that "the decision of what kind of discipline should be imposed was up to the discretion of the supervisor." Aplt. Br. at 48. Ms. Timmerman focuses on the fact that termination was not mandatory, but that assertion, while factually correct, is inapposite. What matters is not whether termination was mandatory, but whether progressive discipline for employees

_____

[10] See, e.g., Aplt. App. at 162 ("Violation of this policy may be grounds for disciplinary action, including termination."); Aplt App. at 165 (same); Aplt. App. at 168 (same).

-23-

violating the fee reversal policy was mandatory. Because progressive discipline was entirely discretionary in such cases, and U.S. Bank, therefore, did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext.

We offer one last observation with respect to U.S. Bank's failure to utilize progressive discipline as evidence of pretext. The district court noted that "[i]t may well be true that defendant's decision was intemperate and unfair" but that "[s]uch considerations . . . are not within the purview of Title VII or the ADEA." Timmerman, 2006 WL 894894, at *4. We agree, and note that the issue is not whether the decision to terminate Ms. Timmerman was wise, fair or correct, but whether U.S. Bank reasonably believed at the time of the termination that Ms. Timmerman had violated company policy, and acted in good faith upon that belief. Young v. Dillon Cos., 468 F.3d 1243, 1250 (10th Cir. 2006). Neither Title VII nor the ADEA prohibits an employer from making hasty decisions that appear harsh; what they forbid are decisions made with discriminatory animus. See E.E.O.C. v. Flasher Co., 986 F.2d 1312, 1321 (10th Cir. 1992).

3. U.S. Bank's More Favorable Treatment of Other Employees

Ms. Timmerman asserts that U.S. Bank's disparate treatment of her in comparison to other U.S. Bank employees caught reversing fees on coworkers' accounts also establishes pretext. A plaintiff seeking to show pretext "often does so by providing evidence that he was treated differently from other similarly-

situated employees who violated work rules of comparable seriousness."

Kendrick, 220 F.3d at 1230. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[11] Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997). Also, a difference in treatment between two employees by the same supervisor does not automatically give rise to a Title VII or ADEA claim:

> Sometimes apparently irrational differences in treatment between different employees that cannot be explained on the basis of clearly articulated company policies may be explained by the fact that the discipline was administered by different supervisors, or that the events occurred at different times when the company's attitudes toward certain infractions were different, or that the individualized circumstances surrounding the infractions offered some mitigation for the infractions less severely punished, or even that the less severely sanctioned employee may be more valuable to the company for nondiscriminatory reasons than is the other employee. Other times, no rational explanation for the differential treatment between the plaintiff and the comparison employees may be offered other than the inevitability that human relationships cannot be structured with mathematical precision, and even that explanation does not compel the conclusion that the defendant was acting with a secret, illegal discriminatory motive.

---

[11] Just recently, we held that the same supervisor rule announced in "Aramburu has no application where . . . plaintiff claims to be a victim of a company-wide discriminatory RIF." Mendelsohn v. Sprint/United Mgmt. Co., 466 F.3d 1223, 1228 (10th Cir. 2006). Despite our limitation of Aramburu in Mendelsohn, the same supervisor rule remains wholly applicable where, as here, an employee claims to be the victim of an allegedly discriminatory disciplinary action. See id. at 1227 ("Since deciding Aramburu, we have only applied the 'same supervisor' rule in the context of alleged discriminatory discipline.").

Flasher Co., 986 F.2d at 1320 (internal citations and footnote omitted).  Hence, it is up to the plaintiff to establish not only that differential treatment occurred, but also to rule out nondiscriminatory explanations for the differential treatment.  See id.

Ms. Timmerman points first to the disparate treatment of Shaunna Stewart, a branch manager in Wyoming, as evidence of pretext.  According to Ms. Timmerman, Ms. Stewart reversed overdraft charges on her own account on two separate occasions but was given only a written warning.  Ms. Timmerman and Ms. Stewart, however, are not similarly situated because Ms. Stewart did not report to Ms. Johnson.[12]  See Kendrick, 220 F.3d at 1233 ("Different supervisors will inevitably react differently to employee subordination").  There is also no evidence that the number and amount of Ms. Stewart's reversals were comparable to the thirty-one reversals for $1,099 that Ms. Timmerman performed.  Accordingly, the fact that Ms. Stewart only received a written warning is of no relevance.

Ms. Timmerman also states that a Greeley, Colorado branch employee refunded fees on her own account but was not terminated.  Ms. Timmerman has presented no evidence, however, to show that this employee was a branch manager, was under the supervision of Ms. Johnson at the time of the incident,

---

[12]  Ms. Stewart reported instead to a district manager in Cheyenne, Wyoming named Jamie Schaneman.  See Aplt. App. at 504, 979.

was not also a female over forty years of age, or refunded an amount of fees comparable to the $1,099 Ms. Timmerman refunded.

Finally, Ms. Timmerman argues that pretext is established by the fact that, shortly after her termination, Jeff Jiron, a male branch manager under the supervision of Ms. Johnson, refunded a coworker's fee and received no discipline at all. While this evidence comes closest to the type needed to show pretext, it nonetheless falls short. First, as the district court noted, Ms. Timmerman has provided no information that Ms. Johnson, or anyone else at U.S. Bank, was even aware that Mr. Jiron had reversed a coworker's fee. This lack of knowledge, and not discriminatory animus, therefore, explains the disparate treatment. Also, even assuming knowledge on the part of Ms. Johnson, Ms. Timmerman has failed to show that the amount of Mr. Jiron's fee reversal was comparable to the $1,099 in fees Ms. Timmerman refunded. This is crucial because in order to infer that the disparate treatment of two similarly situated employees was tinged with discriminatory animus, the two employees' violations of company policy must be of comparable seriousness. See id. at 1232 (explaining that the failure to terminate similar situated employees for violations of work rules did not show pretext "because the[] employees did not violate work rules of comparable seriousness to [plaintiff]"). Because Ms. Timmerman has not shown such to be the case, Ms. Johnson's alleged disparate treatment of Mr. Jiron is insufficient for Ms. Timmerman to survive summary judgment on the issue of pretext.

-27-

4.  The "Disturbing Procedural Irregularities"

Lastly, Ms. Timmerman argues that there existed "disturbing procedural irregularities" surrounding her termination and that this is evidence of pretext. We have previously held that disturbing procedural irregularities surrounding an adverse employment action may demonstrate that an employer's proffered nondiscriminatory business reason is pretextual.  See Simms, 165 F.3d at 1329. The procedural irregularities about which Ms. Timmerman complains are a ten-week gap between the time Ms. Johnson first contacted Ms. Timmerman about the fee reversals and the time Ms. Timmerman was terminated, and the omission of any mention of the fee reversal issue in an employee performance appraisal Ms. Timmerman underwent just a month prior to her termination.  But neither of these things are evidence of pretext because neither can, objectively, be described as a "disturbing procedural irregularity."  Ms. Timmerman has pointed to no U.S. Bank policy which required either immediate termination or that a fee reversal issue be included in an employee's performance appraisal.  Rather, the evidence indicates that Ms. Johnson waited before taking any action in order to confirm that the fee reversals occurred, to verify that Ms. Timmerman was responsible for them, and to consider termination versus a final written warning.  Aplee. Supp. App. at 22-26.  Simply put, Ms. Timmerman has not shown that there were "disturbing procedural irregularities" surrounding her termination.  Thus, the district court properly granted summary judgment to U.S. Bank on Ms.

Timmerman's sex and age discrimination claims.

B.  Title VII and ADEA Retaliation Claims

Along with her sex and age discrimination claims, Ms. Timmerman brought Title VII and ADEA retaliation claims as a result of U.S. Bank's filing of counterclaims against her in this litigation.  U.S. Bank filed state law counterclaims for civil theft, conversion, unjust enrichment, civil conspiracy, aiding and abetting a breach of fiduciary duty, and fraudulent misrepresentation. These claims all arose out of Ms. Timmerman's alleged use of coin counting and notary fees to partially fund an internal "party fund" account from which, at the time of her termination, she withdrew $480.  Ms. Timmerman contends that the only reason U.S. Bank filed its counterclaims was in retaliation for her filing of sex and age discrimination claims against it.  The district court granted summary judgment to U.S. Bank on Ms. Timmerman's retaliation claims, reasoning that the filing of counterclaims is not an adverse employment action and Ms. Timmerman had not shown that U.S. Bank's decision to file its counterclaims was causally connected to Ms. Timmerman's protected activity.  See Timmerman, 2006 WL 894894, at *5.  We agree with the district court that summary judgment for U.S. Bank on Ms. Timmerman's retaliation claims is appropriate, although for a different reason.

Both Title VII and the ADEA forbid employers from retaliating against an employee when that employee takes action in opposition to a discriminatory

-29-

practice.  See 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).  In order to establish a prima facie case of retaliation, an employee must show that: "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action." Duncan v. Mgr., Dep't of Safety, 397 F.3d 1300, 1314 (10th Cir. 2005).  Similar to a discrimination claim, once the employee establishes a prima facie case of retaliation, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001).  If such a reason is successfully articulated, the employee must then demonstrate that the employer's proffered reason for the adverse action is pretextual.  Id.

There is no doubt that Ms. Timmerman has satisfied the first prong of a prima facie case of retaliation—she engaged in the protected activity of filing a lawsuit against U.S. Bank for alleged sex and age discrimination.  The parties disagree, however, on whether the counterclaims filed against Ms. Timmerman constitute an adverse employment action and whether there is a causal connection between Ms. Timmerman's filing of sex and age discrimination claims and U.S. Bank's allegedly retaliatory counterclaims.

Ms. Timmerman is correct that following the Supreme Court's recent decision in Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006), the applicable standard for whether an adverse employment action

-30-

has occurred is whether the employer's actions "would have been materially adverse to a reasonable employee or job applicant." Id. at 2409. In other words, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. While it is certainly an interesting question whether the filing of counterclaims in response to discrimination claims brought by a former employee constitutes an adverse employment action, that question, along with the disputed causation issue, need not be decided in this case. Even assuming, arguendo, that Ms. Timmerman has established a prima facie case of retaliation, U.S. Bank has come forward with a legitimate, nondiscriminatory reason for filing its counterclaims, and Ms. Timmerman has failed to demonstrate that U.S. Bank's reason is pretextual.

U.S. Bank explains that it decided to bring its counterclaims against Ms. Timmerman only after she admitted, during deposition testimony, that she partially funded an internal U.S. Bank "party fund" account using coin counting and notary fees, that she knew the money did not belong to her personally, and that she withdrew a portion of the money from the "party fund" after she was fired and deposited it in her own account at another bank. Aplt. App. at 149-53. We think that the potential diversion and withdrawal of U.S. Bank's funds is a legitimate, nondiscriminatory reason for the employer to file counterclaims against that employee in an attempt to retrieve what was alleged (and here

-31-

admitted) to have been taken.

Given U.S. Bank's legitimate, nondiscriminatory reason for filing its counterclaims, the burden shifts to Ms. Timmerman to show that the proffered reason is merely pretext for a retaliatory adverse employment action. This Ms. Timmerman has not done. Most importantly, Ms. Timmerman has not shown, nor does she even seem to argue, that U.S. Bank's counterclaims are devoid of merit. Cf. Bill Johnson's Rests., Inc. v. N.L.R.B., 461 U.S. 731, 743 (1983) ("The filing and prosecution of a well-founded lawsuit may not be enjoined . . . even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising [his or her] rights . . . ."). As indicated above, based on Ms. Timmerman's admissions during deposition testimony, U.S. Bank's state law counterclaims against Ms. Timmerman had a factual basis.

In her attempt to show that U.S. Bank's counterclaims were purely retaliatory, Ms. Timmerman primarily relies on the fact that U.S. Bank did not file its counterclaims against her until nine months after her original complaint—asserting sex and age discrimination—was filed. Ms. Timmerman claims that U.S. Bank was aware that she had taken the party account funds as far back as September 2003, but did nothing about it until nine months after the September 2004 filing of her discrimination claims. While Ms. Timmerman is correct that there is some evidence indicating that, in September 2003, several U.S. Bank employees, including corporate security, became aware of the sources

-32-

of the internal party fund along with Ms. Timmerman's withdrawal of funds upon her departure, this evidence, standing alone, is not enough to show pretext. Even assuming that U.S. Bank was aware, in 2003, that Ms. Timmerman may have taken bank funds, it did not have Ms. Timmerman's admission until her deposition was taken in April 2005. In sum, Ms. Timmerman has not shown that U.S. Bank's proffered nondiscriminatory reason for filing its state law counterclaims was pretextual, and thus the district court correctly granted summary judgment to U.S. Bank.

C. 42 U.S.C. § 1985(2) Conspiracy Claim Against U.S. Bank

Ms. Timmerman's final federal claim is that U.S. Bank engaged in conspiratorial acts with its outside counsel to interfere with her civil rights in violation of 42 U.S.C. § 1985(2). A claim under § 1985(2) arises when:

> [T]wo or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or . . . conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws . . . .

42 U.S.C. § 1985(2). "The elements of a deterrence claim under section 1985(2) are (1) a conspiracy, (2) to deter testimony by force or intimidation, and (3) injury to the plaintiff." Brever v. Rockwell Int'l Corp., 40 F.3d 1119, 1126 (10th Cir. 1994). Ms. Timmerman specifically avers that U.S. Bank violated § 1985(2) when it allegedly conspired with outside counsel to intimidate a witness into

signing a false declaration by threatening her economic livelihood and to file allegedly bad faith counterclaims against Ms. Timmerman.

As previously mentioned, U.S. Bank's state law counterclaims against Ms. Timmerman had a factual basis and were not devoid of merit. Legal claims possessing a reasonable basis in law and fact simply do not constitute the "force or intimidation" necessary to satisfy § 1985(2). There is also no evidence indicating that the counterclaims were filed "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice." As to the witness intimidation component of Ms. Timmerman's § 1985 claim, she relies exclusively on a declaration of Stacie Chacon (a co-worker). That declaration alleges that U.S. Bank's outside counsel tried to convince Ms. Chacon to sign a pre-typed declaration that was not an accurate representation of events, and that one of U.S. Bank's attorneys warned Ms. Chacon to remember who signs her paychecks and where her loyalties lie. See Aplt. App. at 745. Standing alone, this evidence is insufficient for a jury to infer an agreement between U.S. Bank and its attorneys to either intimidate or threaten Ms. Chacon. See Green v. Benden, 281 F.3d 661, 665 (7th Cir. 2002) ("To establish the existence of a [§ 1985] conspiracy, a plaintiff must show that the conspirators agreed to inflict injury upon him; in other words, that they acted with a single plan . . . ."). Thus, Ms. Timmerman's § 1985(2) claim fails.

AFFIRMED.

-34-

06-1185, Timmerman v. U.S. Bancorp, N.A.,

**Lucero, J.,** concurring.


I concur in the judgment but write separately because I disagree with the majority's treatment of evidence that Johnson replaced all six female Branch Managers with younger males in just twenty months. In my view, the majority conflates the individual decisions of a single supervisor with generalized, large-scale employment decisions.

Although we have stated "a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals," Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991), we have thus far only utilized this principle to evaluate the practices of an employer or a division as a whole. In Fallis, for example, the plaintiff showed that his employer laid off four of 42 geologists under age 40 and three of nine geologists over 40 during a reduction in force. Id. at 746. Noting that Fallis' employer proffered legitimate, non-discriminatory reasons for the disparity, we declined to infer discrimination. In Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526 (10th Cir. 1994), the plaintiff showed that, of 13 employees who took a year-long leave of absence, only three were permitted to return to work. Id. at 532. All three were individuals under the age of 40. Of the ten terminated employees, seven were under the age of 40 and three were over age 40. Because of the small sample size

and lack of evidence that the 13 employees had substantially similar jobs, we held

the plaintiff had not established pretext.  Id. at 533.

These decisions correctly limited the range of inferences that a jury could

draw from such tenuous evidence.  But not all statistics should be dismissed so

readily.[1]  The relevance and nature of the generalized data on employer practices

in Fallis and Cone differ from that of the statistical proffer in the instant case.

Timmerman's claim of discrimination centers on the alleged biases of a single

supervisor, Trish Johnson, and in particular on Johnson's alleged desire to place

younger men in all Branch Manager positions.  Evidence of Johnson's past

Branch Manager hiring decisions speaks directly to this claim.  Indeed, we have

held that statistical evidence much like Timmerman's supports a claim of

---

[1]  In Baylie v. Fed. Reserve Bank, 476 F.3d 522 (7th Cir. 2007) (cited at
Maj. Op. 14), the Seventh Circuit recognized that, in an individual treatment case,
some statistics are more probative than others.  The court provided the following
hypothetical scenario as "the kind that permit[s] a sound inference in an
individual case":

> A plaintiff who accuses Supervisor X of discrimination because he
> never has promoted a black person, and often says disparaging things
> about black workers, is drawing a statistical inference: that if X has
> been indifferent to race, then selections from the pool of employees
> eligible for promotion would have included some black workers, and
> in particular would have included the plaintiff.

Id. at 523, 525.  Other types of statistics, such as a calculation that the average
white worker received an extra promotion every 20th year compared with the
average black worker, are "only marginally relevant when an individual plaintiff
seeks an award of damages."  Id. at 525.

discriminatory termination. In <u>Greene v. Safeway Stores, Inc.</u>, 98 F.3d 554 (10th Cir. 1996), the plaintiff alleged that his supervisor fired him due to a desire to install a new team of younger managers. We concluded that "evidence that within 12 months after [the supervisor] became President (and shortly also the CEO) of Safeway at age 42, eight top-level executives over the age of 50 were replaced by younger persons," "raised a justiciable issue of material fact which must proceed to trial." <u>Id.</u> at 560-61 (citation omitted).[2]

In accordance with <u>Greene</u>, when a plaintiff claims that her supervisor sought to exclude members of her protected class from certain positions, I would

---

[2] The majority asserts that <u>Greene</u> does not have persuasive value because it "is not a case about pretext." (Maj. Op. 19.) As the majority points out, <u>Greene</u> decided whether the plaintiff established his ADEA claim "directly, by presenting direct or circumstantial evidence that age was a determining factor in his discharge." 98 F.3d at 560 (quotations omitted). However, this does not render its analysis of statistical evidence inapplicable to the instant case, decided at the pretext step of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973). Intentional discrimination – the focus in <u>Greene</u> – remains the ultimate question throughout a <u>McDonnell Douglas</u> inquiry. <u>See</u> <u>Ortiz v. Norton</u>, 254 F.3d 889, 896-97 (10th Cir. 2001) ("[I]ntentional discrimination . . . is the ultimate question; consequently it is paradoxical to assert that evidence of discriminatory motive cannot be considered [at the pretext stage].") (quotations and citations omitted).

Nor do I agree that the timing of Johnson's decisions meaningfully distinguishes the present case from <u>Greene</u>. Although <u>Greene</u> held that statistical evidence of events that took place within a year of the plaintiff's firing was material, it did not impose a bright-line rule excluding data older than one year. 98 F.3d at 560. Here, the Branch Manager hiring decisions took place within 20 months of Timmerman's termination. Two of these decisions – for the Branch Managers of the two Fort Collins locations – occurred in spring of 2002 and thus within the one-year window utilized by the majority.

place significant weight on evidence of the supervisor's past hiring practices with respect to those positions. To the extent that the majority discredits such evidence simply because it neither directly addresses an employer's proffered reasons nor compares identical employment actions, I disagree. In my view, this conclusion improperly conflates our caselaw on generalized employment decisions with analysis of an individual supervisor's actions, thereby ignoring qualitative differences between the two types of evidence.

Nonetheless, I agree that the statistics in this case ultimately provide little material support to Timmerman's claim for two reasons.[3] First, as the majority points out, only one incumbent female Branch Manager reapplied for her position. Second, male applicants significantly outnumbered female applicants for the Branch Manager positions. Of six applicants for the two Fort Collins openings, one was female. No women applied for the Longmont/Erie position, and two men and one woman applied for the Greeley position.[4] Upon Timmerman's

---

[3] Johnson also testified that she neither made the final termination decision nor recommended Timmerman's termination. Instead, Steve Lovas, her superior, decided to fire Timmerman at the suggestion of Linda Sincoff. As the majority notes, such a decision cannot be imputed to Johnson. See Campbell v. Gambro Healthcare, Inc., 478 F.3d 1282, 1290 (10th Cir. 2007). Nonetheless, U.S. Bank arguably waived this argument in its brief by stating that Johnson terminated Timmerman's employment.

[4] The record reveals that another woman, Stacie Chacon, applied for the Greeley Branch Manager position at some point in 2001, but the date of her application as well as the circumstances surrounding her sworn statements are unclear. A November 29, 2005 declaration by Chacon states that she submitted an internal application and resume to Johnson in October 2001– two months after

-4-

termination, five men and four women competed for the Loveland Branch

Manager opening. Although Johnson selected a male applicant to replace

Timmerman, one of the female applicants was offered a job as Branch Manager at

another location. Thus, like the majority, I conclude the evidence of Johnson's

---

Jeff Jiron assumed the Greeley position. A second affidavit by Chacon, which is not dated, explains that she applied for the Branch Manager position "shortly after Trish Johnson became the Northern Colorado District Manager." According to this affidavit, Chacon felt that she was denied the position despite her "superior qualifications" and that Johnson discriminated in hiring only young men as Branch Managers. Chacon also attests that a U.S. Bank attorney pressured her to sign a false affidavit, which she refused to do. A third Chacon affidavit, dated January 20, 2006, refutes many of the statements contained in the second affidavit – including those concerning Johnson's discriminatory hiring and the U.S. Bank attorney's attempt to secure a false affidavit. This third affidavit instead contends that Mari Newman, an attorney for Timmerman, drafted a misleading second affidavit that Chacon signed "just to get rid of Newman's incessant telephone calls." Attorney Newman disputes this characterization. According to Newman's sworn statement, Newman reviewed each paragraph of the second affidavit with Chacon and made all requested changes.

It appears that U.S. Bank's contention that Newman violated ethical rules simply by contacting Chacon without U.S. Bank's knowledge or consent is unwarranted. Because Chacon does not have authority to commit U.S. Bank to a position with respect to this litigation, Chacon is a bystander witness and not a represented party. See Ethics Comm. of the Colo. Bar. Ass'n, Formal Op. 69 ¶ 17 (1987) ("Employees who constitute the party are differentiated from those who are bystander witnesses by their authority to commit the organization to a position regarding the subject matter of representation."). Thus, Newman did not need to obtain opposing counsel's consent before speaking to Chacon. Nonetheless, it is troublesome that the record before us contains at least one affidavit with false statements and reveals that attorneys for at least one of the parties acted improperly in their dealings with Chacon. It is also troublesome that at oral argument, counsel for the parties contradicted each other over whether Chacon's statements were submitted as an admission against interest of U.S. Bank in the lower court.

past hiring decisions does not preclude a grant of summary judgment to U.S. Bank.