**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 7, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

EDWARD WILLIAMS,

　　　　Plaintiff-Appellant,

v.

SOLVAY CHEMICALS INC.,

　　　　Defendant-Appellee.

No. 09-8095
(D.C. No. 2:09-CV-00037-ABJ)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **McKAY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **EBEL**, Circuit Judge.

The plaintiff, Edward Williams, sued his former employer, Solvay Chemicals Inc. (Solvay), for breach of contract after Solvay fired him for sleeping on the job. The district court's jurisdiction was based on diversity of citizenship. *See* 28 U.S.C. § 1332. Our appellate jurisdiction arises under 28 U.S.C. § 1291.

---

[*]　　After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In his complaint, Mr. Williams alleged that Solvay had breached an implied employment contract in which Solvay promised to fire him only for good cause. Solvay moved for summary judgment. It argued that even assuming that such an implied contract existed, sleeping on the job constituted good cause for the termination. Mr. Williams responded that Solvay applied its policies against sleeping on the job so inconsistently that a jury could reasonably infer that his firing was arbitrary and pretextual. Because of this, he argued, his firing violated the good-faith standard applicable to the enforcement of employment contracts under Wyoming law.

The district court concluded that the Wyoming cases discussing the good-faith standard do not mandate that an employer act with good faith in any general sense. Rather, the court concluded that Wyoming law requires only that an employer have a good-faith belief that the employee committed a dischargeable act before firing him. Because Mr. Williams admitted that he fell asleep on the job, and because the employee handbook that created the alleged contract expressly permitted Solvay to terminate employees caught sleeping on the job, the court resolved that no genuine issue of material fact existed concerning whether Solvay acted in good faith. The district court therefore granted summary judgment to Solvay on Mr. Williams's contract claim.

Mr. Williams now appeals.  We affirm, but for a slightly different reason than that relied on by the district court.

## BACKGROUND

At the time it terminated his employment, Solvay employed Mr. Williams as a steam plant operator at its soda ash processing plant in Sweetwater County, Wyoming.  He had worked there since 1982, when he was hired by Tenneco, the company that owned the plant prior to Solvay.  When Tenneco hired Mr. Williams, it provided him with an employee handbook.  Although Solvay subsequently distributed one or more new employee handbooks to its employees, the parties agree for summary judgment purposes that it was the Tenneco handbook that governed Mr. Williams's employment with Solvay at all times relevant to this case.  The parties also have stipulated that under the terms of the Tenneco handbook, Mr. Williams could only be fired for good cause.

The Tenneco handbook provided a four-step progressive disciplinary procedure to correct on-the-job problems.  Aplt. App., Vol. II at 258.  The first step ("Counseling Session") required a supervisor to orally notify the employee of the problem and to discuss it with him.  *Id.*  The supervisor would then work with the employee to correct the problem.  *Id.*  At the second step ("Formal Oral Notice"), the supervisor would again notify the employee of the problem, but a written record (known as a "first notification") would be made and placed in the employee's personnel file.  *Id.*  At the third step ("Formal Written Notice"),

disciplinary time off might be given and/or the employee would be given a written reprimand (known as a "second notification"), with a formal probationary period and notice in the employee's record. *Id.* Only at the fourth and final step ("Final Action") would the employee be discharged. *Id.*

The handbook's policies offered a form of forgiveness for employees who had improved their conduct after disciplinary action. It provided that "[i]f an employee has not had a formal written reprimand for a period of twelve (12) months, all reprimands will be removed from the employee's permanent record." *Id.* at 259. On the other hand, for certain "more serious offenses," Tenneco reserved the right to terminate the employee immediately, "without the benefit of other disciplinary procedures." *Id.* at 254. One of these listed serious offenses was "[s]leeping on the job." *Id.*

On February 8, 2008, Mr. Williams was caught sleeping on the job in the boiler control room during his shift at the Solvay plant. Solvay immediately terminated his employment. Two other employees who were caught sleeping on the job with him in the same place at the same time were suspended but not fired.

In justifying Mr. Williams' dismissal, Solvay relies primarily on the "immediate termination" provision of the handbook rather than on its "progressive discipline" provisions. The record reveals, however, that during his employment with Solvay, Mr. Williams had been subject to other disciplinary notifications as well. On July 1, 1999, he received a "first notification" for

failing to check the "dryer cyclone," which had become clogged with particulate matter during his shift. *Id.*, Vol. I at 77-78. On June 12, 2001, he again received a "first notification" charging him with failing "on two different days in May [to] perform up to expectations." *Id.* at 79. On January 17, 2006, he received another "first notification" after he was found in the smoking room "reclined in a chair with his feet up and the lights out." *Id.* at 80. In connection with this notification, Mr. Williams was given the opportunity to dispute the discipline, but he instead signed the form indicating he agreed to alter his behavior in the future.

On October 16, 2007, Mr. Williams was issued a "second notification." *Id.* at 81. The notification stated that he "requested Funeral Leave for September 18th through September 21st for the death of his Grandfather. After further investigation it was discovered the deceased was not his Grandfather. Only eligible family members qualify for paid funeral leave." *Id.* This time, because he "currently [had] a First Behavioral Notification in his personnel file," he was issued a second notification. *Id.* He was warned that "[v]iolations of company policies and/or poor work performance may result in further disciplinary action up to and including termination." *Id.* Mr. Williams again was given the opportunity to dispute the discipline, but instead signed the form indicating that he agreed with it. *Id.*

Mr. Williams testified that Mr. Maxfield, who eventually recommended that he be fired, warned him at the time of the funeral leave incident that he had

"one leg out the door."  *Id.* at 53.  Within four months of this incident, he was fired for sleeping on the job.[1]

## ANALYSIS

### 1.  Standard of Review

Because this case is grounded on diversity jurisdiction, we apply the appropriate state substantive law as announced by the highest court of the forum state, Wyoming.  *See Blanke v. Alexander*, 152 F.3d 1224, 1228 (10th Cir. 1998).[2] "[B]ut we are governed by federal law in determining the propriety of the district court's grant of summary judgment."  *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016 (10th Cir. 2001).  Under this standard, we review the grant of summary judgment to Solvay de novo, applying the same standard as the district court. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1184 (10th Cir.

---

[1]     Mr. Williams also received verbal notices several times in 2007, the year before he was fired.  On February 1, a supervisor caught him sleeping in the steam plant control room and told him sleeping was not allowed and that he should wake up.  Aplt. App., Vol. I at 95.  On May 7, Mr. Williams called a co-worker to remind him to come to work, angering the co-worker.  He was counseled that it was not his place to contact his co-workers about coming to work.  *Id.*  On November 11, Mr. Williams came "out of the storage room in the control room with dark glasses and a pretend walking stick," pretending to be blind as a joke.  A supervisor told him this was unacceptable behavior, particularly in light of the fact that one of his co-workers had trouble seeing.  *Id.* at 97.  In December, Mr. Williams was told to stop wasting time in a class he was taking.  *Id.* at 98-99.  On January 17, 2008, a supervisor warned him that he had left a precipitator hopper full of ash.  *Id.* at 99.  All of these violations were recorded in a written disciplinary log.  *See id.* at 109-10 (written disciplinary log).

[2]     The parties cite no choice of law provision in the handbook that might override the default rule that Wyoming law applies.

-6-

2010).  "That is, summary judgment is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law."  *Id.* (quotation omitted).  "In applying this standard, we examine the factual record and draw reasonable inferences therefrom in the light most favorable to [Mr. Williams]."  *Id.*  (quotation omitted).

## 2.  Good-Faith Standard

As noted, the district court concluded that Wyoming's good-faith standard requires only that an employer have a good-faith belief that the employee committed a dischargeable act before firing him.  We conclude, however, that the Wyoming courts require the trier of fact to determine not only whether the contract permitted termination for the cause the employer specified, but also whether the reason given by the employer was *applied in good faith*.

A number of Wyoming cases support a broader reading of the "good faith" requirement than the district court applied to this case.  In *Worley v. Wyoming Bottling Co.*, 1 P.3d 615, 623 (Wyo. 2000), the Wyoming Supreme Court suggested that an employee's mere admission to the  misconduct used to fire him does not automatically satisfy the good-faith standard, provided the employee can demonstrate a triable issue concerning pretext.  *Worley* was a handbook case in which the employer claimed that the plaintiff's violation of three personnel policies provided good cause for firing him.  The plaintiff apparently did not contest the facts surrounding his commission of these offenses.  But this alone did

not justify summary judgment for the employer, because the plaintiff *did* contest whether his termination for these alleged offenses truly constituted firing "for cause" or was merely pretextual:

> [A] question also remains whether Worley was discharged for cause. Wyoming Bottling claims Worley was terminated for violating three personnel policies. Worley counters that termination for these violations was pretextual since the alleged violations were common, ordinary practices, and two fellow employees corroborated his claim. Whether an employee has been terminated for cause is generally a question of fact and, thus, summary judgment is premature under these disputed facts.

*Id.*

The concept that the employee should be permitted to present evidence that the employer's stated reason is unworthy of belief also finds support in *Capshaw v. WERCS*, 28 P.3d 855 (Wyo. 2001). The employee in that case, Capshaw, worked as president of his employer's subsidiary, WERCS. WERCS fired him for (among other things) "engag[ing] in a campaign intended to disparage management." *Id.* at 856. Capshaw argued that the "pretextual termination reasons [WERCS] cited did not satisfy the good cause standard." *Id.* at 857. He admitted that he had been openly critical of management, but argued that his criticism of management was made in good faith and WERCS therefore lacked good cause for firing him. *See id.* at 858.

The state district court entered an order in limine prohibiting Capshaw from arguing about or presenting evidence of corporate mismanagement. On interlocutory appeal from that order, the Wyoming Supreme Court reversed. It stated that Capshaw "clearly has the right to argue and attempt to persuade the jury that his criticism of management was in good faith and his discharge was in violation of his contract requiring good cause for termination." *Id.* Citing *Worley*, the court stated:

> Where the employer alleges that the employee was discharged for one reason . . . and the employee presents evidence that he was really discharged for another reason . . . the question . . . is one of fact for the jury. ***The jury is always permitted to determine the employer's true reason for discharging the employee.***

*Capshaw*, 28 P.3d at 858 (quoting *Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880, 896 (Mich. 1980) (emphasis in original)).

Another key case that illustrates Mr. Williams's point about pretext is *Life Care Centers of America, Inc. v. Dexter*, 65 P.3d 385 (Wyo. 2003). Life Care Centers (Life Care) employed Ms. Dexter as the activities director in its nursing center. It later terminated her employment, listing "Lack of effort/unsatisfactory performance" as the reason for her discharge. *Id.* at 391 (quotation omitted). After a bench trial, the district court determined that Life Care had breached an implied employment contract with Ms. Dexter by terminating her employment. Life Care appealed.

The Wyoming Supreme Court determined that the district court had failed to make adequate factual findings concerning whether Life Care had good cause to immediately terminate Ms. Dexter's employment. As part of its remand for further fact-finding, the court instructed the district court to consider Life Care's evidence concerning its reasons for terminating Ms. Dexter, but also to consider her evidence "that the reasons given for her discharge were pretextual and Life Care's executive director took a personal dislike to her, terminated her employment without cause, and attempted to justify these actions by later adding supporting documentation to her personnel file." *Id.* at 392.

After advising the district court what evidence to consider, the Wyoming Supreme Court instructed it on how to apply the law of good faith:

> *In addition to applying the terms of the handbook in determining whether there was cause for termination*, we also ask the trial court to apply the good faith standard for review of employer firing decisions applied by the majority of other jurisdictions that have addressed the issue. Under this standard, the question to be resolved by the fact finder is not, "Did the employee *in fact* commit the act leading to dismissal?" Rather, it is, "Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual?"

*Id.* (citations and quotations omitted) (first emphasis added).

The *Life Care* court continued by defining "cause" in terms of good faith, stating:

"Cause" is defined under this standard as

fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, *arbitrary or capricious*, unrelated to business needs or goals, *or pretextual*. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond.

*Id.* (quoting *Cotran v. Rollins Hudig Hall Int'l, Inc.*, 948 P.2d 412, 422 (Cal. 1998)) (emphasis added).

This language suggests that even a reason given by an employer that passes muster under the express terms of the employment contract, and is supported by a good-faith belief that the offending conduct actually occurred, would not be a "good faith" reason if the employer applied it in an arbitrary and capricious or pretextual manner. In other words, it is not enough for the employer simply to identify a reason for termination listed in the handbook, if the employee can show that reason was advanced in bad faith. It is most notable that the Wyoming Supreme Court began its discussion of good faith by requiring the district court to make its good-faith determination "*[i]n addition to* applying the terms of the handbook in determining whether there was cause for termination." *Id.* (emphasis added).

-11-

Mr. Williams has asserted that Solvay did not act in good faith. The district court concluded, however, that according to *Life Care*, the only question under the good-faith standard is whether the employer had "a good-faith belief *that the employee engaged in the proscribed conduct.*" Aplt. App. at 374 (emphasis in original). This interpretation of *Life Care* is inconsistent with the language quoted above and with other Wyoming cases dealing with good-faith termination. *Life Care* requires that an employer who has agreed to terminate only for cause must act in good faith in determining that misconduct constitutes "good cause" for termination. Having clarified the appropriate standard, we now turn to the evidence on the good-faith issue.

### 3. Application of Good-Faith Standard

In exercising our de novo review, we may affirm summary judgment for any basis that appears in the record, whether or not relied on by the district court. *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008), *cert. denied*, 129 S.Ct. 1528 (2009). We will therefore examine whether, under the appropriate standard, Solvay has demonstrated its entitlement to summary judgment on the "good faith" issue.

As noted previously, Solvay has advanced a legitimate reason for Mr. Williams's termination, specifically authorized under his employment contract and factually undisputed. But Mr. Williams contends that this reason is arbitrary and pretextual in light of Solvay's inconsistent application of its policy

against sleeping on the job. He claims he was treated more harshly than his somnolent comrades, who, like him, were found sleeping on the job but, unlike him, were not fired for it. This, he argues, shows Solvay lacked good faith.

**A. Alleged Comparators Were Not Similarly Situated**

Sleeping on the job appears to have been a fairly regular occurrence at Solvay. Mr. Williams asserts that this was due to the long shifts employees worked during late-night hours. Specifically, the evidence he has cited shows:

- Mel Wallendorff fell asleep once and was given a verbal warning.

- Derek Pever and Dave Busey were caught sleeping on the job and each received a second written warning and three days off without pay.

- Rick Garcia, Russ Stewart, and Ken Broadbent all had a reputation for sleeping on the job, but they were not fired for it.

- Rick Coon stated that he had been caught sleeping on the job at least twice but had not been written up, with the exception of the occasion when he was caught along with Mr. Williams in February 2008, leading to Mr. Williams's termination.

- Mr. Zimmerman caught Lyle Simon, Shawn McGarvey, and Kyle Dillard sleeping once on the job, but he did not write them up. He stated he did not write them up because he never caught them sleeping on the job again.

- Mr. Zimmerman also caught Pete Hart sleeping, according to Rick Coon, but he merely yelled at him to wake up and did not write him up for it. Mr. Coon stated that Mr. Hart was found sleeping a total of three times without a write-up.

- Randy Lowseth, a supervisor at Solvay, was observed by other employees sleeping in the control room on occasion.

In order to use these other employees as a comparison point for pretext purposes, Mr. Williams needs to show that he was similarly situated to them. *See, e.g., Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1115 (10th Cir. 2007) (describing inference of pretext created by showing disparate treatment between comparable individuals). He has failed to make this showing. Mr. Williams does not identify any other employee who had a second notification in his file (the penultimate warning prior to termination under the handbook policy), and then was caught sleeping on the job but not fired for it.

Mr. Williams compares himself to Mr. Zimmerman, who was caught sleeping twice, in incidents that occurred eight months apart. Mr. Zimmerman received write-ups each time and was given three-day suspensions each time. After the second incident he received a second notification. Nine months after this second notification, he allowed an unauthorized person to ride on a "surface maintenance mule," a serious violation of both company policy and applicable

law.  *Id.* at 309.  He was given a "notification" marked "other" rather than "first" or "second" notification, but was not fired.  *Id.*

Like Mr. Williams, Mr. Zimmerman had a second notification in his file when he was found to have committed another serious offense.  Unlike Mr. Williams, he was not fired.  But this evidence alone is insufficient to create a genuine issue of material fact concerning whether he was "similarly situated" to Mr. Williams, resulting an proof of arbitrary or pretextual action.  Under the handbook, Solvay was not *required* to terminate an employee for a "serious" incident, but reserved discretion to do so.  *See id.* at 254 ("more serious offenses *can* lead to immediate termination") (emphasis added); 258 ("*As a last resort*, the employee will be discharged.") (emphasis added).  More importantly, different supervisors issued the final discipline to Mr. Zimmerman and to Mr. Williams.  *See id.* at 155-56 (depo. pp. 45-47); 202 (depo. pp. 19-20).  Mr. Zimmerman's disciplinary history therefore does not show that Solvay's actions were arbitrary or pretextual in Mr. Williams's case.  *See, e.g., Timmerman*, 483 F.3d at 1121 (stating fact that employee had different supervisor tends to undermine pretext claim based on differential treatment of allegedly similarly-situated employees).

### B.  Prior Discipline Was Not Itself Pretextual

Mr. Williams argues that the very fact that he had a second disciplinary notice in his file demonstrates pretext, separate and apart from the incident that resulted in his termination.  We believe, however, that while an employee could

certainly attempt to show that prior disciplinary notifications were themselves pretextual, the evidence Mr. Williams adduces does not create a genuine issue of material fact on this point.

Mr. Williams targets his second notification, which he received for misuse of funeral leave. He attempts to show that the discipline meted out to him for that incident was itself pretextual. The Tenneco manual provides that "[w]hen a death occurs in your immediate family you may receive up to three (3) consecutive work days off with pay to attend the funeral." Aplt. App., Vol. II at 267. It defines "[y]our immediate family" to include "your spouse, children, parents, brothers, sisters, and any of these related to you by marriage. Funeral leave may also be granted in case of a grandparent or someone who permanently resides in your household if you attend the funeral." *Id.*

Mr. Williams received forty-eight hours of funeral leave to attend the funeral of a man he claimed was his grandfather. According to the disciplinary notification, "[a]fter further investigation it was discovered the deceased was not his Grandfather." *Id.*, Vol. I at 81. Mr. Williams did not contest the notification. He now claims, however, that the man whose funeral he attended, should be considered his mother's father, even though his mother's actual father had died previously, at a very young age, and the man neither married Mr. Williams's

mother nor adopted him.  The man whose funeral he attended was the person who took care of his mother after her father died, perhaps his uncle, though this is unclear.[3]  Significantly, Mr. Williams did *not* reveal the nature of this relationship when he requested the leave; he just asked for leave to attend his "grandfather's" funeral.  *Id.*, Vol. II, at 211 (depo. pp. 70-71).

Mr. Williams, who is Hispanic, now argues that in the Hispanic community, this man would have been considered his grandfather.  But he provides no evidence that he explained this to Solvay when requesting and receiving funeral leave.  Moreover, when given the opportunity to provide a written response to the disciplinary action, he declined.  *Id.* at 81.  If he had a basis for claiming that the man whose funeral he attended was his grandfather, this would have been his chance to explain it.  In sum, while Mr. Williams's view concerning his compliance with the funeral leave policy may differ from Solvay's, there is no indication that Solvay acted pretextually in disciplining him for attending the funeral of someone whom it did not consider his grandfather.

Mr. Williams also argues that the "first notification" on which Solvay relied, the incident in the smoking room, was itself arbitrary or pretextual.  He states:  "Inasmuch as [supervisor] Zimmerman chose to write Williams up on an earlier occasion when he was simply reclined in a chair with the lights out and not

---

[3]     In his deposition, Mr. Williams explained that the man lived with his aunt, but was not married to her.  Aplt. App., Vol. II at 211 (depo. pp. 72-73).

sleeping, at the same time he chose not to write up Rick Coon or Pete Hart for the two or three occasions he found them sleeping, it is not surprising that Williams would have more discipline in his file than the others." Aplt. Opening Br. at 14. Again, this incident has only limited relevance because, under Solvay's policy, the written reprimand from the smoking room incident should have been removed from the file and disregarded due to the passage of time by the time Williams was caught sleeping on the job in 2008.[4] Indeed, although the smoking room incident was in the back of Mel Wallendorff's mind when he recommended that Mr. Williams be fired, he stated that it was the funeral leave time and the February 2008 sleeping incident that resulted in the recommendation for termination. Aplt. App., Vol. II at 202 (depo. p. 20).

But even if the smoking room incident is relevant and Solvay relied on it, it Mr. Williams did not protest at the time of that incident that the discipline was unfair. Instead, he signed off on the discipline, stating that "I have read, understand and agree to alter the above behavior by following the given expectations." Aplt. App., Vol. I at 80.

## C. Alleged "Favoritism" Does Not Show Pretext

Mr. Williams argues that Mr. Garcia, Mr. Stewart, and Mr. Broadbent were favorites of supervisor Wallendorff and this somehow explains why they were not

---

[4]    Mr. Williams could therefore have protested about receiving a "second notification" for the funeral leave incident, since the smoking room incident was more than a year old. But he did not.

disciplined, even though they were caught sleeping on the job. But a careful reading of the deposition testimony shows that while Mr. Wallendorff admitted that he had been accused of favoring these employees (among others) in their job assignments and discipline, he denied that he had caught any of these men sleeping on the job. *Id.*, Vol. II at 201 (depo. p. 17). So he could not have exercised favoritism on their behalf with regard to sleeping on the job.

Finally, although Mr. Williams complains that other employees who slept on the job sometimes received no discipline at all, and were just awakened and told to get back to work, he neglects to mention that the same is true of himself. Mr. Williams was caught sleeping on February 1, 2007, for example, but was merely told to wake up and was not written up for it. There is also evidence that he was repeatedly found sleeping on the job by a frustrated co-worker who complained to a supervisor that he had to call to wake him up, but Mr. Williams points to no evidence he was formally disciplined for those incidents. *Id.* at 205 (depo. pp. 62-63).

In sum, Mr. Williams has failed to demonstrate that his firing for sleeping on the job was either arbitrary or pretextual. He fails to show Solvay did not act

in good faith in firing him. The district court therefore properly granted summary judgment to Solvay on his breach-of-contract claim.

## CONCLUSION

The judgment of the district court is therefore AFFIRMED.

Entered for the Court

Wade Brorby
Senior Circuit Judge